IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| Salia Issa, et al, <br>     Plaintiffs, <br><br> v. <br><br> Texas Department of Criminal Justice, et al, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> )    CIVIL ACTION NO: 1:22-cv-1107-ADA <br> ) <br> ) <br> ) <br> ) <br> ) |

## **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff in the above-captioned case, through counsel, hereby moves for partial summary judgment on certain parts of her claims.[1]

## **SUMMARY**

This case involves allegations that Defendant-TDCJ refused to allow Plaintiff to leave her place of employment while she was approximately seven months pregnant—notwithstanding the fact that she was experiencing a pregnancy emergency and notwithstanding the fact that she repeatedly informed Defendant-TDCJ, through the individual defendants, of the pregnancy emergency. Plaintiff was not allowed to leave for over two hours. When Plaintiff left, she drove immediately to the hospital, where emergency surgery was unsuccessful. The unborn child died.

---

[1] Although there were initially multiple plaintiffs in this case, there is now only one (Salia Issa). As such, "Plaintiff" as used herein refers to Salia Issa.

In this response, Defendant-Texas Department of Criminal Justice is referred to as "Defendant-TDCJ." The individual defendants are referred to as "Defendant-Thompson," "Defendant-Hooper," and "Defendant-Hammond."

For the reasons set forth below, Plaintiff hereby moves for partial summary judgment as follows:

   a. On elements 1, 2, and 4 of Count 1;

   b. On Count 5 in full;

   c. On elements 1 (in part[2]) and 2 of Counts 7 and 8;

   d. On element 1 of Count 29; and

   e. On elements 1, 2, and 3 of Count 31.

For the remaining parts of Plaintiff's claims, as well as for damages, Plaintiff acknowledges that genuine disputes of material fact remain, which must be resolved by a jury.

## BACKGROUND

1. Plaintiff was hired by Defendant-TDCJ as a corrections officer in 2018. *See* Exhibit 1, Excerpts from Plaintiff's personnel record, p. 1. Plaintiff worked at Defendant-TDCJ's Middleton unit in Abilene from 2018 through summer 2021. *See* Exhibit 2, Plaintiff's deposition, p. 28:2–12. Plaintiff transferred to Defendant-TDCJ's Travis County unit in summer 2021 for several months, learned she was pregnant, and then transferred back to the Middleton unit in fall 2021. *See* Exhibit 2, Plaintiff's deposition, pp. 28:13–29:2.

2. On November 15, 2021, Plaintiff was working at the Middleton unit as a Corrections Officer IV. *See* Exhibit 1, Excerpts from Plaintiff's personnel record, pp. 3–4. Plaintiff was approximately 28 weeks pregnant, with a due date in early February 2022. *See* Exhibit 2, Plaintiff's deposition, p. 155 (doctor's note)[3]; Exhibit 3, Excerpts from Plaintiff's medical record, pp. 1–3 and 5.

---

[2] Counts 7 and 8 are Equal Protection claims pursuant to § 1983 based on sex discrimination in public employment. Element 1 of those claims is a violation of a federal or Constitutional right, which in this case overlaps with Count 1 (Title VII sex discrimination). Thus, Plaintiff moves for summary judgment to the extent the claims overlap.

[3] Unless otherwise noted, Plaintiff has included the deposition testimony as well as exhibits admitted at the deposition. If a deposition *exhibit* is cited, as opposed to deposition *testimony*, Plaintiff has so indicated with a parenthetical.

3. Plaintiff was scheduled to work an overnight shift, from approximately 6:00pm until 6:00am the following day. *See* Exhibit 2, Plaintiff's deposition, pp. 36:25–37:2 and 41:14–16; Exhibit 5, Defendant-Hooper's deposition, p. 14:3–13. However, Plaintiff was running late and did not arrive until approximately 6:40pm. *See* Exhibit 2, Plaintiff's deposition, p. 43:1–13.

4. While working that night, Plaintiff was assigned to the "picket" in building A1. *See* Exhibit 5, Defendant-Hooper's deposition, p. 40 (written statement). The "picket" is a secure room inside the building, depicted as follows:



*See* Exhibit 5, Defendant-Hooper's deposition, pp. 13:18–14:8; Exhibit 13, Color photos from Plaintiff's interrogatory answers, p. 1. *See also* Exhibit 2, Plaintiff's deposition, p. 137 (interrogatory answer #5).

5. At approximately 8:00pm or 8:15pm, Plaintiff experienced pain that was consistent with a contraction. *See* Exhibit 2, Plaintiff's deposition, p. 63:4–20.[4]

---

[4] As Plaintiff acknowledges, the reason this is only a *partial* motion for summary judgment is because there are genuine disputes of material fact about what happened from the time Plaintiff started experiencing pain (or otherwise feeling unwell) through the time she ultimately left the prison grounds. This background section focuses on facts that are largely undisputed.

6. Plaintiff would eventually leave her post and drive to the hospital. *See* Exhibit 2, Plaintiff's deposition, p. 138 (interrogatory answer #5). In order to exit the prison grounds, Plaintiff was required to pass through multiple secure passageways (sometimes called "sally ports"), meaning Plaintiff could not simply leave or walk out without Defendant-TDCJ's cooperation; Defendant-TDCJ's personnel were necessary to open these secure passageways. *See* Exhibit 2, Plaintiff's deposition, p. 138 (interrogatory answer #5). Plaintiff went through secure passageways to exit building A1, to exit the main building, and again to exit the prison grounds into the parking lot. *See* Exhibit 2, Plaintiff's deposition, p. 138 (interrogatory answer #5). The below image depicts the secure passageways with red circles, along with red arrows showing the path Plaintiff exited:



*See* Exhibit 2, Plaintiff's deposition, p. 138 (interrogatory answer #5); Exhibit 13, Color photos from Plaintiff's interrogatory answers, p. 2.

7. Plaintiff arrived at the hospital just after midnight. *See* Exhibit 3, Excerpts from Plaintiff's medical record, pp. 1–5. Plaintiff's unborn child, a male, would ultimately die. *See* Exhibit 3, Excerpts from Plaintiff's medical record, pp. 1, 2–3 and 5. Plaintiff suffered a placental abruption that led to the child's death. *See* Exhibit 3, Excerpts from Plaintiff's medical record, pp. 2–3 and 5.

8. Additional facts are set forth below as necessary.

## STANDARD OF REVIEW

9. "A party may move for summary judgment, identifying each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Federal Rule of Civil Procedure 56(a) (emphasis added).

## AUTHORITIES: Count 1—Title VII (disparate treatment, sex)

10. Title VII of the Civil Rights Act of 1964, as amended, prohibits employment discrimination based on sex. *See* 42 U.S.C. §§ 2000e–2000e-17. *See also* 42 U.S.C. § 2000e-2(a)(1) (stating the specific prohibition on discrimination).

11. Sex discrimination includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions," and "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work[.]" 42 U.S.C. § 2000e(k).

12. In *Young v. United Parcel Service, Inc.*, the Supreme Court analyzed disparate treatment pregnancy discrimination. 135 S. Ct. 1338 (2015). To establish a claim, in the absence of direct evidence, the plaintiff must show that: (1) the plaintiff belongs to the protected class; (2) the plaintiff sought

5

accommodation; (3) the employer did not accommodate the plaintiff; and (4) the employer did accommodate others similar in their ability or inability to work. *Id.* at 1354.

### ARGUMENT: Count 1—Title VII (disparate treatment, sex)

13. Plaintiff hereby moves for summary judgment on elements 1, 2, and 4 of this claim.

Element 1.

14. Plaintiff belonged to a protected class. The below evidence demonstrates this point:

    a. On Plaintiff's employee information sheet completed upon being hired by Defendant-TDCJ in 2018, Plaintiff clearly circled "F" (for female) as her sex. *See* Exhibit 1, Excerpts from Plaintiff's personnel record, p. 2. Defendant-TDCJ accurately captured this fact in Plaintiff's personnel record. *See* Exhibit 1, Excerpts from Plaintiff's personnel record, p. 1.

    b. In submitting paperwork to Defendant-TDCJ requesting a transfer back to the Middleton unit in fall 2021, Plaintiff cited her pregnancy as a reason for the transfer. *See* Exhibit 2, Plaintiff's deposition, pp. 154 and 156 (transfer paperwork). Plaintiff also submitted a note from her treating physician explaining that—as of October 18, 2021—Plaintiff was 24 weeks pregnant. *See* Exhibit 2, Plaintiff's deposition, p. 155 (doctor's note).

    c. Plaintiff's female sex is further confirmed by records from the emergency department from the early morning of November 16, 2021. *See* Exhibit 3, Excerpts from Plaintiff's medical record, pp. 1–5. And Plaintiff's pregnancy is further confirmed by the fact that, in the early morning of November 16, 2021, emergency department personnel delivered a deceased infant. *See* Exhibit 3, Excerpts from Plaintiff's medical record, pp. 2–3 and 5.

15. In reviewing the evidence cited above, it is indisputable that Plaintiff was a pregnant female on November 15, 2021. As such, summary judgment is appropriate on this element.

Element 2.

16. Plaintiff sought an accommodation. The below evidence demonstrates this point:

    a. Plaintiff stated under oath that, prior to the end of her shift, she made requests to both Defendant-Thompson and Defendant-Hooper to leave. *See* Exhibit 2, Plaintiff's deposition, pp. 84:5–85:14.

    b. Defendant-Thompson also stated under oath that Plaintiff requested to leave before the end of her shift on November 15, 2021. *See* Exhibit 4, Defendant-Thompson's deposition, p. 51 (corrected written statement).[5]

    c. Defendant-Hooper similarly stated under oath that Plaintiff requested to leave before the end of her shift on November 15, 2021. *See* Exhibit 5, Defendant-Hooper's deposition, pp. 12:4–21 and 40 (written statement).

17. In reviewing the evidence cited above, it is undisputed that Plaintiff requested to leave before the end of her shift on November 15, 2021. This was the accommodation request—to leave early. While there are genuine disputes of material fact about the timing and number of Plaintiff's requests, how quickly the requests were responded to, and the content of the parties' conversations, those disputes all go to element 3—i.e., whether Defendant-TDCJ actually failed to accommodate Plaintiff. Element 2, however, is undisputed and thus warrants summary judgment in Plaintiff's favor.

Element 4.

18. Defendant-TDCJ did accommodate others similar in their ability or inability to work. The below evidence demonstrates this:

---

[5] Defendant-Thompson gave an initial written statement as part of Defendant-TDCJ's internal investigation. *See* Exhibit 4, Defendant-Thompson's deposition, p. 48 (initial written statement). Defendant-Thompson later corrected that statement. *See* Exhibit 4, Defendant-Thompson's deposition, p. 5 (corrected written statement). The corrected statement was explained in his interrogatories. *See* Exhibit 4, Defendant-Thompson's deposition, p. 55 (interrogatory answer #4) and 56 (interrogatory answer #7). The corrected statement was then adopted in his deposition. *See* Exhibit 4, Defendant-Thompson's deposition, pp. 13:24–14:5 and 33:1–14.

    a. Plaintiff stated under oath that Defendant-TDCJ had previously allowed her, when not pregnant, to leave shifts early due to medical reasons. *See* Exhibit 2, Plaintiff's deposition, p. 139 (interrogatory answer #8). Plaintiff remembers other non-pregnant correctional employees of Defendant-TDCJ who were similarly accommodated. *See* Exhibit 2, Plaintiff's deposition, p. 140 (interrogatory answer #8 cont'd). Plaintiff has testified that such accommodations were typically granted within 20 minutes. *See* Exhibit 2, Plaintiff's deposition, pp. 139–140 (interrogatory answer #8).

    b. Defendant-TDCJ has stated under oath that, prior to November 15, 2021, it had allowed non-pregnant correctional employees to leave shifts early due to medical reasons. *See* Exhibit 6, Defendant-TDCJ's interrogatory answers, pp. 11–13 (interrogatory answers #6–12). Such accommodations had been granted for at least the six years leading up to November 15, 2021, and within the previous two years at the Middleton unit specifically. *See* Exhibit 6, Defendant-TDCJ's interrogatory answers, pp. 11–13 (interrogatory answers #6–12).

19. In reviewing the evidence cited above, there is no genuine dispute of material fact as to this element. Non-pregnant employees had been accommodated—i.e., allowed to leave early—prior to the incident giving rise to this lawsuit. As such, summary judgment in Plaintiff's favor is appropriate on element 4.

### AUTHORITIES: Count 5–Title VII (disparate impact, sex)

20. Disparate impact discrimination addresses employment practices or policies that are facially neutral in their treatment of protected groups, but which in fact have a disproportionately adverse effect on such protected groups; proof of discriminatory motive is not required. *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006). *See also Garcia v. Woman's Hospital of Texas*, 97 F.3d 810, 813 (5th Cir. 1996). Statistical evidence is not required if the plaintiff can demonstrate that

all or substantially all people within the group would be impacted by the practice or policy. *Garcia*, 97 F.3d at 813.

## ARGUMENT: Count 5–Title VII (disparate impact, sex)

21. This claim requires (1) a facially neutral policy, (2) which has a disproportionately adverse effect on a protected group. There are no genuine disputes of material fact on either element; as such, Plaintiff moves for summary judgment in full on this claim.

Element 1.

22. Defendant-TDCJ had a policy entitled PD-22, *General Rules of Conduct and Disciplinary Action Guidelines for Employees* (revision 17, effective November 1, 2021). *See* Exhibit 7, Defendant-TDCJ's policy PD-22. The policy stated:

    > An employee shall not leave the assigned work area without proper authorization. A correctional employee shall not leave the assigned security post until properly relieved.

    *See* Exhibit 7, Defendant-TDCJ's policy PD-22, p. 40.

23. Leaving a post without authorization or without being properly relieved was a Level 2 violation. *See* Exhibit 7, Defendant-TDCJ's policy PD-22, p. 40. Such a violation subjected an employee to dismissal. *See* Exhibit 7, Defendant-TDCJ's policy PD-22, p. 56.

24. Defendant-TDCJ also had an additional policy in place more specifically applicable to correctional officers assigned to a "picket," such as Plaintiff. *See* Exhibit 12, Defendant-TDCJ's policy, PO-07.020. According to that policy, Plaintiff was required to "[r]emain in the assigned duty post at all times unless properly relieved." *See* Exhibit 12, Defendant-TDCJ's policy, PO-07.020, p. 1.

25. In reviewing the evidence cited above, it is indisputable that Defendant-TDCJ had a facially neutral policy in place which prohibited Plaintiff from leaving her post without proper authorization or without being properly relieved. As such, summary judgment is appropriate on this element.

Element 2.

26. Even without statistical evidence, element 2 can be proven by demonstrating that all or substantially all people within the protected group would be impacted by the policy. Plaintiff has made this showing and summary judgment is appropriate on this element.

27. Plaintiff has disclosed two expert specialists in obstetrics and gynecology (OBGYN), who will opine as to this element. Dr. Neil Simmerman will opine that a "reasonably prudent ObGyn would have advised Ms. Issa, or any pregnant woman experiencing [her] symptoms, to leave and seek medical attention no later than 2030." *See* Exhibit 8, Expert report of Dr. Neil Simmerman, p. 2. Dr. Neera Bhatia will similarly opine that any OBGYN adhering to the standard of care would advise a patient experiencing a placental abruption to immediately seek medical care. *See* Exhibit 9, Expert report of Dr. Neera Bhatia, p. 4 (answer #11).

28. Plaintiff's evidence on this element is unrefuted. As the Court is aware, Plaintiff has challenged both the late designation and the reliability of Defendants' retained OBGYN expert, Dr. Mark Akin.[6] However, even if Dr. Akin's testimony is considered, he does not contradict or challenge Plaintiff's experts on these specific opinions. *See* ECF #64-1, Expert report of Dr. Mark Akin. Put another way, there is no genuine dispute of material fact that all or substantially all OBGYNs would have advised Plaintiff to leave and seek medical care, yet Defendant-TDCJ's facially neutral policy prohibited it. *See Garcia*, 97 F.3d at 813 ("If all or substantially all pregnant women would be advised by their obstetrician not to lift 150 pounds, then they would certainly be disproportionately affected by this supposedly mandatory job requirement for LVN's at the Hospital. Statistical evidence would be unnecessary if Garcia could establish this point."). Plaintiff has established the point that *Garcia* highlighted as showing a disparate impact and, as such, summary judgment is warranted on this element and claim.

---

[6] *See generally* ECF #57–59, 61–62, and 64–67. The motions remain pending.

**AUTHORITIES: Counts 7 & 8—§ 1983 (equal protection)**

**against Defendant-Hooper and Defendant-Thompson**

29. For a claim under § 1983, a plaintiff must show (1) a deprivation of rights secured by the Constitution or laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law. *Lauderdale v. Texas Department of Criminal Justice*, 512 F.3d 157, 165 (5th Cir. 2007). *See also, e.g., Anderson v. Valdez*, 845 F.3d 580, 599 (5th Cir. 2016).

30. Sex discrimination in public employment violates the Equal Protection Clause of the Fourteenth Amendment and is therefore actionable under § 1983. *See Lauderdale*, 512 F.3d at 165–166. *See also Southard v. Texas Board of Criminal Justice*, 114 F.3d 539, 550 (5th Cir. 1997). Title VII and § 1983 claims are parallel causes of action; thus, in the employment context, an equal protection claim brought pursuant to § 1983 has essentially the same elements as a Title VII claim. *Lauderdale*, 512 F.3d at 166.

**ARGUMENT: Counts 7 & 8—§ 1983 (equal protection)**

**against Defendant-Hooper and Defendant-Thompson**

Element 1.

31. Plaintiff incorporates her briefing on Count 1, *see supra* ¶¶ 13–19, and hereby moves for summary judgment on elements 1, 2, and 4 as they pertain to the underlying deprivation of rights secured by the Constitution or laws of the United States.

Element 2.

32. As for element 2, there is no genuine dispute of material fact that Defendant-Hooper and Defendant-Thompson were acting under color of state law as supervisors with workplace authority over Plaintiff. The below evidence demonstrates this point:

   a. Plaintiff has stated under oath that Defendant-Hooper and Defendant-Thompson were her supervisors on November 15, 2021, and that those were the individuals who Plaintiff called

  in seeking to leave her post. *See* Exhibit 2, Plaintiff's deposition, p. 141 (interrogatory answer #13).

 b. Defendant-Hooper has stated under oath that she was supervising Plaintiff on November 15, 2021. *See* Exhibit 5, Defendant-Hooper's deposition, pp. 9:14–10:6. Defendant-Hooper has further acknowledged that she was involved in the response to Plaintiff's request to leave early from her shift. *See* Exhibit 5, Defendant-Hooper's deposition, p. 40 (written statement).

 c. Defendant-Thompson has stated under oath that he was supervising Plaintiff on November 15, 2021. *See* Exhibit 4, Defendant-Thompson's deposition, pp. 11:16–12:2. Defendant-Thompson has further acknowledged that he was involved in the response to Plaintiff's request to leave early from her shift. *See* Exhibit 4, Defendant-Thompson's deposition, p. 51 (corrected written statement).

 d. Defendant-TDCJ's roster also listed Defendant-Hooper and Defendant-Thompson as having been the supervisors on duty. *See* Exhibit 10, Supervisor roster, p. 1.

33. In reviewing the evidence cited above, it is indisputable that Defendant-Hooper and Defendant-Thompson were acting under color of state law as supervisors with workplace authority over Plaintiff. As such, summary judgment is appropriate on this element.

**AUTHORITIES: Count 29—Rehabilitation Act (denial of a reasonable accommodation)**

34. Section 504 of the Rehabilitation Act of 1973 broadly prohibits discrimination based on disability by providing that no recipient of federal funds may discriminate against an otherwise qualified individual "solely by reason of [their] disability." 29 U.S.C. § 794(a). *See also Flynn v. Distinctive Home Health Care, Inc.*, 812 F.3d 422, 425-426 (5th Cir. 2016).

35. The standards used to assess discrimination under the Rehabilitation Act are the same as the standards used under the Americans with Disabilities Act (ADA). *See* 29 U.S.C. § 794(d). *See also Flynn*, 812 F.3d at 426–427. There is one exception, however, to this general rule—due to the

plain language of the Rehabilitation Act, a violation will only be found if the discrimination is based "solely" on an individual's disability. *See generally Soledad v. U.S. Department of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002). This is different from the causation standard used in cases under the ADA. *Id.*

36. Title I of the ADA prohibits employment discrimination based on disability. *See* 42 U.S.C. §§ 12111–12117. *See also* 42 U.S.C. § 12112(a) (stating the specific prohibition on discrimination).

37. Under the statute, a "disability" (as relevant to this case) is defined as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A). Major life activities include things such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working," as well as the operation of a major bodily function, such as "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2).

38. Failing to provide a reasonable accommodation is a form of disability discrimination. *See* 42 U.S.C. § 12112(b)(5). To establish failure-to-accommodate disability discrimination, the plaintiff must show: (1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations. *Weber v. BNSF Railway Co.*, 989 F.3d 320, 323 (5th Cir. 2021). *See also Credeur v. Louisiana*, 860 F.3d 785, 792 (5th Cir. 2017).

**ARGUMENT: Count 29—Rehabilitation Act (denial of a reasonable accommodation)**

39. Plaintiff hereby moves for summary judgment on element 1 of this claim, that she was a qualified individual with a disability. There is no genuine dispute of material fact as to this element, as demonstrated by the below evidence:

a. Plaintiff was *qualified* to work as a correctional officer because Defendant-TDCJ had hired her in 2018 and continued to employ Plaintiff in that position as of November 15, 2021. *See* Exhibit 1, Excerpts from Plaintiff's personnel record, pp. 1 and 3–4; Exhibit 2, Plaintiff's deposition, p. 12:3–12; Exhibit 4, Defendant-Thompson's deposition, pp. 11:25–12:2; Exhibit 5, Defendant-Hooper's deposition, pp. 9:24–10:6.

b. Plaintiff was also an individual with a disability. Plaintiff was experiencing a pregnancy emergency, specifically, a placental abruption. *See* Exhibit 3, Excerpts from Plaintiff's medical record, pp. 2–3 and 5. Plaintiff's pain was similar to a contraction. *See* Exhibit 2, Plaintiff's deposition, p. 63:10–20. As Plaintiff explained in her interrogatories, "Plaintiff's pain that night was terrible and it became worse as the night went on. Plaintiff could feel her baby moving more and more as the pain worsened. Plaintiff could not do her job. Plaintiff could not even stand so she had to lay down. When Plaintiff eventually was allowed to leave, standing and walking were very difficult. Plaintiff had to move slowly due to the extreme physical pain. Even driving was difficult due to the extreme physical pain." *See* Exhibit 2, Plaintiff's deposition, p. 143 (interrogatory answer #17).

c. Further, although expert testimony is not required on this element,[7] Plaintiff has nonetheless retained two expert OBGYNs to opine that Plaintiff's condition met the definition of a disability. *See* Exhibit 8, Expert report of Dr. Neil Simmerman, p. 4; Exhibit 9, Expert report of Dr. Neera Bhatia, p. 4 (answer to question #10). As before, even if the testimony of Defendants' retained OBGYN expert, Dr. Mark Akin, is considered, summary judgment is still appropriate because Dr. Akin does not contradict or challenge Plaintiff's experts'

---

[7] *See* 29 C.F.R. § 1630.2(j)(1)(v) ("The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate.").

opinions that Plaintiff met the definition of a disability. *See* ECF #64-1, Expert report of Dr. Mark Akin.

40. Plaintiff's pregnancy emergency constituted her disability. That disability substantially limited Plaintiff's ability to concentrate, think, work, and perform other manual tasks, and the disability impacted the operation of—and in fact was based upon—her reproductive functions. As such, summary judgment is warranted on this element.

**AUTHORITIES: Count 31—Family and Medical Leave Act (family-care provision)**

41. To be an eligible employee under the FMLA, the person must have been employed for at least 12 months and they must have worked at least 1,250 hours during the preceding 12 months. 29 U.S.C. § 2611(2)(A).

42. An eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period in order to care for a "son" or "daughter" with a "serious health condition." 29 U.S.C. § 2612(a)(1)(C). A "son" or "daughter" is defined as "a biological, adopted, or foster child, a stepchild, a legal ward, or a child of a person standing in loco parentis, who—is under the age of 18 years of age; or 18 years of age or older and incapable of self-care because of a mental or physical disability." 29 U.S.C. § 2611(12). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves—inpatient care in a hospital, hospice, or residential medical care facility; or continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

43. It is unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). To make a *prima facie* case of an FMLA interference claim, the plaintiff must show that: (1) the plaintiff was an eligible employee; (2) the employer was subject to FMLA requirements; (3) the plaintiff was entitled to leave; (4) the plaintiff gave proper notice of their intent to take FMLA leave, and (5) the

15

employer denied the plaintiff the benefits to which they were entitled under the FMLA. *Tatum v. Southern Co. Services, Inc.*, 930 F.3d 709, 713 (5th Cir. 2019).

44. "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a).

**ARGUMENT: Count 31—Family and Medical Leave Act (family-care provision)**

45. Plaintiff hereby moves for summary judgment on elements 1, 2, and 3 of this claim.

Element 1.

46. There is no genuine dispute of material fact as to whether or not Plaintiff was an eligible employee. She was. Plaintiff had been a full-time employee of Defendant-TDCJ since 2018. *See* Exhibit 1, Excerpts from Plaintiff's personnel record, p. 1. Defendant-TDCJ's personnel records explicitly stated that Plaintiff was eligible for FMLA leave. *See* Exhibit 1, Excerpts from Plaintiff's personnel record, p. 5.

47. Summary judgment is clearly appropriate on this element.

Element 2.

48. Defendant-TDCJ was subject to FMLA by law, as it was a public agency. *See* 29 U.S.C. § 2611(4)(A)(iii). *See also* 29 U.S.C. § 203(x) (explicitly including State government and State agencies). On this element, there is no dispute and summary judgment is warranted.

Element 3.

49. As a family-care provision claim, Plaintiff was entitled to leave if she was seeking to care for a "biological [...] child [...] under the age of 18" with a "serious health condition." There is no genuine dispute of material fact that Plaintiff's unborn child met this criteria, as evidenced by the following:

a. Plaintiff was over 28 weeks pregnant with the unborn child. *See* Exhibit 3, Excerpts from Plaintiff's medical record, p. 1. Previously during the pregnancy, when Plaintiff was receiving care prior to moving to Abilene, the unborn child's cardiac activity and heart rate had been detected. *See* Exhibit 3, Excerpts from Plaintiff's medical record, p. 6; Exhibit 9, Expert report of Dr. Neera Bhatia, p. 3 (answer to question #1). Fetal heart tones were also detected, and then lost, at the hospital on November 15, 2021. *See* Exhibit 3, Excerpts from Plaintiff's medical record, pp. 1 and 2.

b. Plaintiff herself testified under oath as to how much the unborn child was moving on November 15, 2021. *See* Exhibit 2, Plaintiff's deposition, pp. 84:13–14, 85:12, and 141 (interrogatory answer #13). It goes without saying that a deceased fetus does not move significantly. As one of Plaintiff's retained OBGYN experts has explained, movement is indicative of a live fetus, and the child was considered viable outside the womb as of November 15, 2021. *See* Exhibit 9, Expert report of Dr. Neera Bhatia, pp. 3–4 (answers to questions #2 and #3).

c. While the FMLA's definitions are silent beyond what is described above, as of November 15, 2021, the State of Texas unequivocally considered unborn children as people under the law. *See, e.g.,* Civil Practice and Remedies Code § 71.001(4)[8] (defining an "individual" as including "an unborn child at every stage of gestation from fertilization until birth."); Health and Safety Code § 170.002(a)[9] (prohibiting abortions during the third trimester when the unborn child is viable); and Health and Safety Code §§ 171.202 and 171.204[10] (making legislative findings about the significance of fetal heartbeats on viability, and further prohibiting

---

[8] Most recent amendments taking effect September 1, 2003.

[9] Most recent amendments taking effect November 14, 2017.

[10] Most recent amendments taking effect September 1, 2021.

17

abortions after the detection of a fetal heartbeat). The State of Texas continued to take that position even after the events giving rise to this case, passing yet another law protecting unborn life. *See generally* Health and Safety Code Chapter 170A.[11]

d. As for the serious health condition, the emergency department OBGYN who treated Plaintiff explained that placental abruption is the premature separation of the placenta from the uterine wall prior to delivery of the child. *See* Exhibit 11, Deposition of Dr. Laura Ceballos, p. 74:6–10. Placental abruption deprives the child of oxygen and other essential nutrients. *See* Exhibit 9, Expert report of Dr. Neera Bhatia, p. 4 (answer to question #7); Exhibit 11, Deposition of Dr. Laura Ceballos, p. 74:11–14. Placental abruption is life threatening to both the mother *and the child*. *See* Exhibit 9, Expert report of Dr. Neera Bhatia, pp. 3 and 4 (answer to question #8); Exhibit 11, Deposition of Dr. Laura Ceballos, p. 74:15–17.

e. Both of Plaintiff's retained OBGYN experts have opined that a placental abruption meets the definition of a serious health condition for both the mother *and the child*. *See* Exhibit 8, Expert report of Dr. Neil Simmerman, p. 4; Exhibit 9, Expert report of Dr. Neera Bhatia, p. 4 (answer to question #9). As before, Defendant's retained OBGYN expert, Dr. Akin, does not contradict or challenge Plaintiff's experts' opinions on this issue. *See* ECF #64-1, Expert report of Dr. Mark Akin. Simply put, in cases of placental abruption, the child is deprived of oxygen and other nutrients needed to live, and the child can die without timely medical intervention. That meets the definition of a serious health condition.

50. To summarize, this case involves (1) an unborn child in its third trimester, (2) whose heartbeat had been detected, both before and on November 15, 2021, (3) who was viable outside the womb, (4) who was moving significantly as of November 15, 2021, (5) in a state that protected

---

[11] Effective August 25, 2022.

abortions after the detection of a fetal heartbeat). The State of Texas continued to take that position even after the events giving rise to this case, passing yet another law protecting unborn life. *See generally* Health and Safety Code Chapter 170A.[11]

d. As for the serious health condition, the emergency department OBGYN who treated Plaintiff explained that placental abruption is the premature separation of the placenta from the uterine wall prior to delivery of the child. *See* Exhibit 11, Deposition of Dr. Laura Ceballos, p. 74:6–10. Placental abruption deprives the child of oxygen and other essential nutrients. *See* Exhibit 9, Expert report of Dr. Neera Bhatia, p. 4 (answer to question #7); Exhibit 11, Deposition of Dr. Laura Ceballos, p. 74:11–14. Placental abruption is life threatening to both the mother *and the child*. *See* Exhibit 9, Expert report of Dr. Neera Bhatia, pp. 3 and 4 (answer to question #8); Exhibit 11, Deposition of Dr. Laura Ceballos, p. 74:15–17.

e. Both of Plaintiff's retained OBGYN experts have opined that a placental abruption meets the definition of a serious health condition for both the mother *and the child*. *See* Exhibit 8, Expert report of Dr. Neil Simmerman, p. 4; Exhibit 9, Expert report of Dr. Neera Bhatia, p. 4 (answer to question #9). As before, Defendant's retained OBGYN expert, Dr. Akin, does not contradict or challenge Plaintiff's experts' opinions on this issue. *See* ECF #64-1, Expert report of Dr. Mark Akin. Simply put, in cases of placental abruption, the child is deprived of oxygen and other nutrients needed to live, and the child can die without timely medical intervention. That meets the definition of a serious health condition.

50. To summarize, this case involves (1) an unborn child in its third trimester, (2) whose heartbeat had been detected, both before and on November 15, 2021, (3) who was viable outside the womb, (4) who was moving significantly as of November 15, 2021, (5) in a state that protected

---

[11] Effective August 25, 2022.

unborn children pursuant to myriad state laws. That meets the criteria of a "biological [...] child [...] under the age of 18" with a "serious health condition." Thus, Plaintiff was entitled to leave to seek care for her unborn child, and summary judgment is warranted on this element.

WHEREFORE, Plaintiff asks this Court to grant Plaintiff's motion.


Respectfully submitted,

/s/ Ross A. Brennan
Bar No. 29842-64
Cronauer Law, LLP
668 Main St, Unit D
Buda, TX 78610
ross@cronauerlaw.com
512-733-5151 (phone)


## CERTIFICATE OF SERVICE

Undersigned counsel certifies that he served the foregoing document on all Defendants through electronically filing the same with the Court's CM/ECF system.


Respectfully submitted,

/s/ Ross A. Brennan
Bar No. 29842-64
Cronauer Law, LLP
668 Main St, Unit D
Buda, TX 78610
ross@cronauerlaw.com
512-733-5151 (phone)

## APPENDIX OF EXHIBITS

All documents stamped with "IssaDef" were produced by Defendants. As such, Defendants should consider this notice pursuant to Local Rule CV-16(d) that Plaintiff may use the documents cited in this motion at trial.

| | |
|---|---|
| Exhibit 1 | Excerpts from Plaintiff's personnel record |
| Exhibit 2 | Plaintiff's deposition |
| Exhibit 3 | Excerpts from Plaintiff's medical record |
| Exhibit 4 | Defendant-Thompson's deposition |
| Exhibit 5 | Defendant-Hooper's deposition |
| Exhibit 6 | Defendant-TDCJ's interrogatory answers |
| Exhibit 7 | Defendant-TDCJ's policy, PD-22 |
| Exhibit 8 | Expert report of Dr. Neil Simmerman |
| Exhibit 9 | Expert report of Dr. Neera Bhatia |
| Exhibit 10 | Supervisor roster |
| Exhibit 11 | Deposition of Dr. Laura Ceballos (without the complete medical record exhibit) |
| Exhibit 12 | Defendant-TDCJ's policy, PO-07.020 |
| Exhibit 13 | Color photos from Plaintiff's interrogatory answers[12] |

---

[12] The original produced photos and the original interrogatory answers were in color. However, the copy of Plaintiff's interrogatories admitted at her deposition was printed in black-and-white.